Sullivan v. H. P. Hood & Sons, Inc.

BERTHA L. SULLIVAN vs. H. P. HOOD & SONS, INC.
& another.

Suffolk.    April 5, 1960. — June 23, 1960.

Present: WILKINS, C.J., SPALDING, COUNIHAN, WHITTEMORE,
& CUTTER JJ.

*Actionable Tort. Sale,* Warranty, Sale of food, Parties. *Food. Damages,* For breach of contract, For breach of warranty, Nominal damages. *Notice. Practice, Civil,* Auditor: report of evidence.

Portions of the report of an auditor whose findings were not to be final, describing what a witness "testified" or "testimony" or "conflicting evidence," did not comply with the rule to him to find facts.    [218]

Discussion of the principle stated in *Spade* v. *Lynn & Boston R.R.* 168 Mass. 285.    [221–222]

A woman who was not harmed physically by merely drinking milk containing fecal matter from a mouse found dead by her in the carton which had contained the milk and which had been negligently packaged by a milk producer was not entitled in an action of tort to recover from the producer for physical illness resulting solely from the "severe emotional shock" suffered by her when she saw the dead mouse and realized what she had drunk.    [223]

The proprietor of a market where a carton of milk was sold to a woman who was not harmed physically by merely drinking milk containing fecal matter from a mouse which she found dead in the carton, but who became physically ill solely as a result of the "severe emotional shock" suffered by her when she saw the dead mouse and realized what she had drunk, was liable to her for only nominal damages in an action for breach of the implied warranty of merchantability.    [223]

In an action of contract by a widow living with her unmarried adult son against a corporation operating a market for breach of the implied warranty of merchantability of milk purchased at the market by the son and drunk by the plaintiff, evidence warranted findings that the son made the purchase on behalf of the plaintiff and that in a conversation with the defendant's president three or four days after the plaintiff drank the milk and became ill the son gave seasonable notice of breach of warranty as required by the Sales Act.    [223–224]

CONTRACT OR TORT.    Writ in the Superior Court dated June 2, 1955.

The action was tried before *Coddaire, J.*

*Philander S. Ratzkoff*, (*Thomas R. Morse, Jr.*, with him,) for the defendants.

*John F. Finnerty*, for the plaintiff.

WILKINS, C.J.   The plaintiff drank milk from a container in which was a dead mouse.   In this action of contract or tort the first count against H. P. Hood & Sons, Inc., the producer, is based upon negligence.   The second count against B. J. Lang's Provision Company, Inc., which sold the container of milk, is for breach of warranty of merchantability.   G. L. c. 106, § 17 (2).   The case was first heard by an auditor whose findings of fact were not to be final.   He found for the plaintiff on both counts.   At a trial in the Superior Court the jury returned a verdict for the plaintiff on each count.   The defendants excepted to the denial of motions for directed verdicts and to the denial of a motion to strike certain findings of the auditor.   On the second count there is a contention in the alternative that the plaintiff is entitled, at most, to nominal damages.

We first set forth "preliminary findings of fact" of the auditor.   The plaintiff was a widow residing in Pembroke.   Living with her was her unmarried adult son John.   On Sunday, March 14, 1954, he purchased at Lang's market a quart of Hood's milk in a cardboard container, which was sealed.   The top of the container was flat, and at one corner was a round hole through which the milk could be poured.   This opening had a hinged cardboard cover.   The son frequently made purchases for his mother, sometimes paying cash and sometimes charging to her account.   As to his testimony that he did not remember which he did this time, the auditor stated, "I am convinced by further testimony, and I so find, that this purchase was for the use in the household by both John" and his mother.

The container was placed unopened in the plaintiff's refrigerator.   On Monday morning the plaintiff took out the carton and poured some milk in a cup of coffee, which she drank.   She then replaced the carton in the refrigerator.   An hour later, about 9 A.M., she took out the carton and poured a glass of milk, which she drank, and then returned

the carton to the refrigerator. About 9:50 A.M. she again removed the carton from the refrigerator and poured another glass which she drank. As she was drinking the second glass, she felt some "little stuff" go into her mouth and down her throat. Each of the two previous times when she had any of the milk "she felt that there was a 'funny feeling in the carton.'" After pouring the second glass, she felt as if something was moving inside it. She poured most of the milk in the sink, and, saw "a lot of 'little things' in it." When she poured out all the milk, she saw a dead mouse in the carton.

After a moment she started toward the telephone to call her daughter, but "she began to sweat and her stomach turned and she found that she couldn't get to the phone." She put her head on the kitchen table and slept from about ten o'clock until about two o'clock. She then answered a telephone call from her daughter, who came to the house in five or six minutes. The plaintiff told the daughter what had happened and fell asleep in a chair. She "slept most all that evening and night and all the next day. During this time she broke into about fifteen or twenty sweats." On Tuesday night she itched, and on Wednesday morning there was a rash all over her body, face, and hands. The rash subsequently turned into sores. "During the first six weeks she had fifteen or twenty sweats every day and she itched. The itching interfered with her sleep." She was nauseated. Since March 15, 1954, the plaintiff has had no milk. When she thinks of the incident, as she does frequently, her stomach turns.

We omit the auditor's descriptions of the expert medical opinions given on behalf of the plaintiff or the defendants. The "preliminary findings" lack any clearcut statement of fact based upon such testimony. These descriptions are, for the most part, couched in terms of what a doctor "testified," or are described as "testimony," or as constituting "conflicting evidence." The duty of the auditor under the rule issued to him was to find facts and not to report evidence. *Spirito* v. *Capar*, 337 Mass. 431, 432, and cases cited. See G. L. c. 221, § 56.

The preliminary findings go on to state that testimony was introduced to show the method of manufacture of the carton by American Can Company and the subsequent filling of the carton with milk by Hood at its East Bridgewater plant. We do not repeat the findings on these subjects because they are not material to the view we take of the case.

"While the testimony on behalf of the defendants seems to indicate that it would be improbable for a mouse to be in the carton of milk at the time it was purchased by John Sullivan, I am satisfied that it was there at the time it was purchased. The fact that there was fecal matter within the milk confirms my feeling that the mouse was alive in the carton at some time prior to the introduction of milk into the carton. This can only lead to the inference that the defendant H. P. Hood & Sons, Inc., was negligent in the packaging of its milk."

Here follow "Ultimate findings of fact based upon the foregoing preliminary findings of fact." Some of these, as numbered by the auditor, are: 1. "[T]he purchase of the carton of milk by John Sullivan was made for and on behalf of the plaintiff." 2. "[T]here was an implied warranty of merchantability made by B. J. Lang Provision Company, Inc., in said sale." 3. "[T]he milk so purchased was unmerchantable in that it contained a foreign substance, to wit: a dead mouse and fecal matter from the mouse." 4. "[T]here was a breach by B. J. Lang's Provision Company, Inc., of the implied warranty of merchantability." 5. "[A]s a result of the breach and by drinking the milk the plaintiff sustained injuries." 6. "[A]s a result of drinking the milk the plaintiff suffered no deleterious effect from taking into her body the fecal matter and . . . no serious bodily harm was caused her by such intake." 7. "However . . . the plaintiff suffered a severe emotional shock when she saw the dead mouse in the milk, and she realized that she had drunk some of the fecal matter from a dead mouse, and . . . as a result of such emotional shock she has developed a condition within her body which causes her to

break out into perspiration, which in turn so irritates her skin that she has developed a rash over much of her body, and in addition has made her nervous and caused her blood pressure to be increased." 9. "[T]he defendant H. P. Hood & Sons, Inc., was negligent in filling with milk a carton containing a mouse." Findings 11 and 12 were noncumulative findings for the plaintiff in the sum of $4,000 on counts 1 and 2 respectively.

At the jury trial the plaintiff introduced the auditor's report and evidence relating to notice to Lang of the alleged breach of warranty. There was testimony by the plaintiff's son that in a conversation he had with the president of Lang three or four days after she drank the milk he said that she had been made quite ill and that "she should bring suit because of that damage to her." A so called confirmatory letter dated April 27, 1954, from the plaintiff's lawyer to Lang was admitted in evidence.

At the conclusion of the evidence the defendants moved to strike the auditor's ultimate findings numbered 1, 2, 4, 5, 9, 11, and 12 "inasmuch as they are not warranted by his preliminary findings of fact" on which they are based. The judge denied this motion as well as the defendants' motions for directed verdicts, and they excepted. Findings 9 and 11 relate to count 1 against Hood. The other findings which are the subject of the motion to strike concern count 2 against Lang.

Before proceeding further, interpretation must be made of ultimate findings 5, 6, and 7. The sixth finding, read as a whole, means that the plaintiff was not harmed physically by actually drinking the milk. The first clause states flatly that she "suffered no deleterious effect" from ingesting the contents of the carton. The second clause refers, we think superfluously, to "no serious bodily harm." If possible, the two clauses must be read as constituting intelligent consistency. If the plaintiff was not harmed, she was not seriously harmed. The sixth finding, taken in connection with the seventh, which begins "However," shows that a distinction was intended to be drawn from the "severe emo-

Sullivan *v.* H. P. Hood & Sons, Inc.

tional shock'' which she suffered ''when she saw the dead mouse in the milk.'' The fifth finding has to do with breach of warranty and necessarily refers exclusively to count 2. The statement that ''by drinking the milk the plaintiff sustained injuries'' must refer to the ''severe emotional shock'' mentioned in the seventh finding, and is not to be reasonably understood as creating a conflict with the sixth finding, which immediately follows.

We shall not pause to discuss the question of the negligence of Hood. For purposes of this case, we shall assume that such negligence could be found.

This brings us to the question whether the plaintiff's recovery is prevented by the principle stated in *Spade* v. *Lynn & Boston R.R.* 168 Mass. 285, 290: ''We remain satisfied with the rule that there can be no recovery for fright, terror, alarm, anxiety, or distress of mind, if these are unaccompanied by some physical injury; and if this rule is to stand, we think it should also be held that there can be no recovery for such physical injuries as may be caused solely by such mental disturbance, where there is no injury to the person from without.'' This rule has been subjected to considerable refinements. In *Homans* v. *Boston Elev. Ry.* 180 Mass. 456, where recovery was allowed for a slight injury and an accompanying nervous shock due to the same cause, Chief Justice Holmes said (p. 457) that the *Spade* doctrine ''is an arbitrary exception, based upon a notion of what is practicable, that prevents a recovery for visible illness resulting from nervous shock alone.'' See *Smith* v. *Postal Tel. Cable Co. of Mass.* 174 Mass. 576, 577–578. In *Cameron* v. *New England Tel. & Tel. Co.* 182 Mass. 310, 312, it was again Chief Justice Holmes who said: ''The principle of the *Spade* case is confined strictly to cases where the connection of the physical illness with the fright is wholly internal. When the fright reasonably induces action which results in external injury, the defendant may be liable as well as when the impact is brought about without the intervention of the plaintiff's consciousness.'' In *Freedman* v. *Eastern Mass. St. Ry.* 299 Mass. 246, recovery

was permitted by a passenger who suddenly twisted her shoulder when she jumped from her seat to escape impending danger from a broken window.   After a full citation of our cases, Mr. Justice Dolan said for the court (p. 250) : "We are of opinion that it cannot be said as matter of law that a blow or impact must be shown to prove a physical injury from without.   The phrase 'from without' as used in our cases excludes purely psychological or emotional consequences when they stand alone, but includes all physical injury not resulting solely from mental shock or emotional disturbances.   The question, therefore, in each such case is whether the physical injury resulting from the defendant's negligence is in fact one which was not caused solely by mental disturbances."

The last two of our cases applying the *Spade* rule were for breaches of warranty in the sale of food.   In *Wheeler* v. *Balestri,* 304 Mass. 257, the recovery of other than nominal damages was denied in an action for breach of warranty by a purchaser of bread who became ill as a result solely of psychological and emotional disturbances caused by seeing a dead cockroach embedded in half a slice of bread she was about to eat and the other half of which she had just eaten. In *Kennedy* v. *Brockelman Bros. Inc.* 334 Mass. 225, 227, it was held error not to grant a request for instructions to the effect that "the plaintiff cannot recover for any physical injury she sustained solely by her mental disturbance upon seeing a worm contained in the corn sold by the defendant."   There was evidence, by which the defendant was not bound, that the plaintiff had in fact swallowed half the worm.   The request was pertinent to a state of facts which the jury might find.

We have not been asked to overrule the *Spade* case, and we are not disposed to do so.   What we have been asked to do is to draw a distinction on the ground that swallowing fecal matter of a mouse constituted a "battery."   Reliance is placed upon *Commonwealth* v. *Stratton,* 114 Mass. 303, where there was an intentional act amounting to the crime of assault and battery.   In modern law "the tort of battery

is now confined to intentional invasions of the interests in freedom from harmful or offensive contact.'' Harper and James, Torts, § 3.3, p. 216. See *McGuire* v. *Almy,* 297 Mass. 323; Restatement: Torts, §§ 13, 14. We are not dealing with a battery, and we are unwilling to hold that the plaintiff suffered an injury ''from without.'' No case of ours has gone to that extent.

What we have said disposes of the Hood count. The motion of that defendant for a directed verdict should have been granted.

There are other questions arising in the Lang count. If there was a breach of the implied warranty of merchantability, nominal damages could be recovered in any event. *Wheeler* v. *Balestri,* 304 Mass. 257, 259. Consequently, there was no error in the denial of the motion for a directed verdict. *Nathan* v. *Tremont Storage Warehouse, Inc.* 328 Mass. 168, 171, and cases cited. *Rayden Engr. Corp.* v. *Church,* 337 Mass. 652, 662n. But the issue of substantial damages was presented by the motion to strike. It is clear, however, from what we have said as to the Hood count, that the plaintiff cannot recover more than nominal damages against Lang.

Under the Sales Act, which is applicable, an action for breach of warranty can be brought only by the one to whom the warranty was given. *Pearl* v. *Wm. Filene's Sons Co.* 317 Mass. 529, 530–531.[1] It was an issue of fact whether the plaintiff or her son was the purchaser. *Kennedy* v. *Brockelman Bros. Inc.* 334 Mass. 225, 227. The defendant Lang contends that the auditor's ultimate finding that the son made the purchase upon behalf of the plaintiff was not correct upon the basis of the preliminary findings. Where there is nothing at stake but nominal damages, we shall not labor the point. See *Feeney* v. *Eastern Racing Assn. Inc.* 303 Mass. 602, 603, and cases cited; *United Shoe Mach. Corp.* v. *Gale Shoe Mfg. Co.* 314 Mass. 142, 143; 4 C. J. S.,

---

[1] Under the Uniform Commercial Code, G. L. c. 106, § 2–318, as appearing in St. 1957, c. 765, § 1, the warranty would cover ''any natural person who is in the family or household'' of the buyer. This did not take effect until October 1, 1958. St. 1957, c. 765, § 21.

Appeal & Error, § 53.   We think that the ultimate finding
of agency may be upheld.   See *Groce* v. *First Natl. Stores
Inc.* 268 Mass. 210, 213.   Similarly, we do not extend dis-
cussion as to notice of breach of warranty under G. L. ·
c. 106, § 38.[1]   The conversation between the president of
Lang and the plaintiff's son could be found to be a season-
able compliance with § 38.   *Mastercraft Wayside Furni-
ture Co.* v. *Sightmaster Corp.* 332 Mass. 383, 387.   The ad-
mission of the letter was at most harmless.

The exceptions are sustained.   On count 1 judgment is to
be entered for the defendant.   On count 2 judgment is to be
entered for the plaintiff for nominal damages.

*So ordered.*

---

[1] The relevant provision of the Uniform Commercial Code is G. L. c. 106,
§ 2–607, as appearing in St. 1957, c. 765, § 1.