Troy, Paul E., J.
INTRODUCTION
Following the death of her husband, Roger J. Darke, Susan Darke, individually, and as executrix of Mr. Darke’s estate, filed an action for medical malpractice against the defendants, the Estate of Jeffrey M. Isner, M.D., Jeffrey M. Isner, M.D., James Symes, M.D., Douglas Losordo, M.D., Caritas St. Elizabeth’s Medical Center of Boston, Inc. (“St. Elizabeth’s”), and Vascular Genetics, Inc. (“VGI”). The defendants now move for partial or complete summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons discussed hereafter, the Estate of Dr. Isner’s motion for summary judgment as to Counts II, III, IV, and VII is DENIED and as to Counts I, VI, and X is ALLOWED. Dr. Symes’ motion as to Count III is DENIED and as to Counts I, VI, and VII is ALLOWED. Dr. Losordo’s motion as to Count II is ALLOWED. St. Elizabeth’s motion as to Count X is ALLOWED. VGI’s motion based on the absence of vicarious liability for the acts of Dr. Isner only is DENIED and as to Count II is ALLOWED.
BACKGROUND
The undisputed facts, and any disputed facts viewed in a light most favorable to the non-movant, are presented as follows.
In light of the prevalence of cardiovascular disease and cardiovascular-related deaths in the United States, Dr. Isner, now deceased, who was chief of cardiovascular research at St. Elizabeth’s, developed a vascular therapy program involving the injection of a certain human gene, which produces a substance called VEGF2, into bodily tissue to promote the formation and differentiation of blood vessels. In nonclinical studies, this “gene therapy” demonstrated increased blood flow to obstructed or constricted body parts, including the heart, which implicated the effectiveness of such therapy in treating patients with advanced coronary artery disease (CAD).
In 1997, in connection with Dr. Isner’s research, St. Elizabeth’s, which owned certain patents relating to Dr. Isner’s work, Cato Holding Company, Human Genome Sciences, Inc. and Dr. Isner formed VGI to develop and commercialize gene therapy products for the treatment of vascular disease. Both Dr. Isner and St. Elizabeth’s held a twenty percent ownership interest in VGI and were represented on the Board of Directors.
In 1999, VGI submitted to the United States Food and Drug Administration (FDA) an application to sponsor VEGF2 treatment for CAD on a human clinical basis. Because the use of VEGF2 to treat CAD was investigational and experimental in nature, the protocol for the clinical study was subject to regulation and approval by the FDA.
According to FDA regulations, if the FDA finds a problem with the clinical protocol, it can order a “clinical hold” to suspend an investigation, or interrupt a clinical trial if problems arise during the study. Before allowing a clinical protocol to continue, the FDA frequently requires modifications to the protocol to ensure that all known problems or safety issues have been addressed.
On March 11, 1999, the FDA insisted on the modification of the admission criteria for VGI’s gene therapy program to exclude from the study patients who were candidates for coronary artery bypass surgery or other revascularization procedures. After this revision, the clinical trial in which Mr. Darke participated commenced at St. Elizabeth’s.
As sponsor of the clinical study, VGI provided the VEGF2-producing gene to the clinical investigators to administer to patients participating in the study by direct injection into the heart. Dr. Isner was the principal investigator for the clinical study and Drs. Symes and Losordo, among other medical practitioners at St. Elizabeth’s, were subinvestigators involved in the CAD clinical trial at the time Mr. Darke participated in the program.
*421 Mr. Darke suffered from chronic cardiovascular disease, including CAD. In November 1993, Mr. Darke underwent triple bypass surgeiy, after which his condition remained stable and treatable. However, in 1999, Mr. Darke again began to experience chest pains. On January 25, 1999, Mr. Darke presented at the Beth Israel Deaconess Medical Center (“Beth Israel”) complaining of chest pain and was referred for cardiac catheterization. The catheterization revealed that the vein grafts in his heart had occluded.
In a letter dated February 24, 1999, Dr. Robert Johnson, a surgeon at Beth Israel, offered to Dr. Lance Larsen, Mr. Darke’s treating cardiologist, the possibility of repeat coronary revascularization surgeiy for Mr. Darke’s persistent angina, about which Mr. Darke expressed concern because his vein grafts occluded so quickly after his last surgery. In light of Mr. Darke’s concern and Dr. Larsen’s belief that Mr. Darke was not a good candidate for percutaneous coronary intervention, Dr. Larsen suggested that Mr. Darke consider the gene therapy program at St. Elizabeth’s headed by Dr. Isner.
Dr. Larsen referred Mr. Darke to Dr. Losordo by letter dated March 12, 1999, in response to which the coordinator of the gene therapy program sent Mr. Darke information describing the gene therapy treatment. On May 3, 1999, Dr. Joel Shelkrot, Mr. Darke’s primary care physician, wrote Dr. Losordo stating that Mr. Darke had exhausted all other medical options and indicated Mr. Darke’s continued interest in the gene therapy treatment.
After consulting members of the gene therapy program at St. Elizabeth’s, Mr. Darke and his wife agreed to his participation in the clinical trial. As part of the patient screening phase for the trial, Mr. Darke underwent several diagnostic tests, including an endocardial mapping test and coronary angiography performed by Dr. Isner and Dr. Peter Vale at St. Elizabeth’s. Based on his test results and medical histoiy, Dr. Isner referred Mr. Darke to Dr. Symes for a consultation, after which Dr. Symes determined that Mr. Darke qualified for the gene therapy program.
On May 24, 1999, Mr. Darke was admitted to St. Elizabeth’s to undergo the gene therapy treatment. This same day, Mr. Darke signed an “Informed Consent for Experimental Procedures” in the presence of Dr. Vale, which disclosed the investigational nature of the clinical study and enumerated the potential risks associated with gene therapy treatment. The consent form did not disclose that a patient had died during her participation in the initial phase of the gene therapy program. Nor did the form disclose St. Elizabeth’s or Dr. Isner’s financial interest in VGI.
On May 25, 1999, Mr. Darke underwent surgeiy in which Dr. Symes injected VEGF2 into Mr. Darke’s heart. Dr. Symes did not review the consent form with Mr. Darke prior to surgeiy. The following day, approximately twenty hours after the surgery, Mr. Darke died.
On May 17, 2002, Ms. Darke, individually, and as executrix of the estate of Mr. Darke, filed the instant action for medical malpractice and wrongful death. An amended complaint was filed on August 7, 2002. In her amended complaint, Mrs. Darke claims that her husband’s death was the result of his participation in the experimental gene therapy program sponsored by VGI and under the direction and care of Drs. Isner, Symes, Losordo and St. Elizabeth’s.
On June 26, 2003, pursuant to G.L.c. 231, §60B, a Medical Malpractice Tribunal was convened. The Tribunal ruled in favor of Drs. Isner, Symes, and Losordo as well as St. Elizabeth’s, finding Mr. Darke’s death to be an unfortunate medical result.[1] Subsequently, Mrs. Darke appealed the Tribunal’s ruling and filed the requisite bond of $6,000 in accordance with G.L.c. 231, §60B to pursue her medical malpractice and wrongful death claims in this court.
DISCUSSION
I. Standard for Summaiy Judgment
Summaiy judgment shall be granted only where there are no issues of material facts in dispute and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P 56(c). In deciding a motion for summaiy judgment, the court views the facts in the light most favorable to the non-moving party. G.S. Enters, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating the absence of a triable factual issue and of showing that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party demonstrates the absence of a triable issue, the non-moving party must set forth specific facts establishing the existence of a genuine dispute as to a material fact. Correllas v. Viveiros, 410 Mass. 314, 317 (1991). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and requires summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Even if the facts of the case are disputed, “summaiy judgment is still available if the party with the burden of proof at trial. . . fails to present in the summaiy judgment record, taking eveiything it says as true and drawing all reasonable inferences in its favor, sufficient facts to warrant a finding in its favor.” NG Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002).
II. Claims Against Dr. Isner
The Estate of Dr. Isner has moved for summary judgment on Mrs. Darke’s claims of intentional batteiy (Count I), negligence/wrongful death (Count II), gross negligence (Count III), intentional infliction of emotional distress (Count IV), breach of contract (Count VI), deceit, intentional misrepresentation, and fraud *422 in the inducement (Count VII), and violation of G.L.c. 93A (Count X).
A. Intentional Battery (Count I)
In the Commonwealth, to maintain an action for the intentional tort of battery, the plaintiff carries the burden of proving that the defendant acted with the intent to cause a harmful or offensive contact with the plaintiffs person and a harmful contact with the plaintiffs person directly or indirectly resulted. Waters v. Blackshear, 412 Mass. 589, 590 (1992); Sullivan v. H.P. Hood & Sons, Inc., 341 Mass. 216, 222-23 (1960). Where the plaintiff consents to such contact, his or her consent bars an allegation of battery. In re Spring, 380 Mass. 629, 638 (1980); Belger v. Arnot, 344 Mass. 679, 684 (1962).
In the context of a medical malpractice action, a claim of battery parallels the doctrine of informed consent inasmuch as the rationale underlying both entails a person’s right in being free from “non-consensual invasion of his bodily integrity.” Harnish v. Children’s Hosp. Medical Center, 387 Mass. 152, 154 (1982). Therefore, both claims involve the same general concept regardless of whether consent was inadequate or nonexistent. Nevertheless, in determining whether a defendant committed an intentional battery, the question is whether the plaintiff consented to the contact at issue; whereas, for a breach of informed consent, the question is whether the plaintiffs consent was based upon erroneous or inadequate information. Erikson v. Garber, 2003 Mass.App.Div. 125, *2-3 (2003).
In this case, Mrs. Darke’s claim of intentional battery relates to the May 25, 1999, gene therapy procedure performed on Mr. Darke by Dr. Symes. It is undisputed that Mr. Darke consented to undergo this procedure. Therefore, Mrs. Darke cannot establish her intentional battery claim against Dr. Isner. Accordingly, the estate of Dr. Isner’s motion for summary judgment as to Count I for intentional battery is ALLOWED.
B. Negligence/Wrongful Death (Count II)
Mrs. Darke argues that Dr. Isner owed Mr. Darke, as his patient, duties of care to which Dr. Isner was required to adhere and that Dr. Isner breached such duties resulting in injury to the Darkes. The estate of Dr. Isner contends that it is entitled to summary judgment as to this count because the facts as alleged do not demonstrate that a sufficiently close doctor-patient relationship existed between Mr. Darke and Dr. Isner at the time of the alleged negligence. Therefore, the primary issue before the court is whether a doctor-patient relationship in fact existed between Dr. Isner and Mr. Darke at the time of Mr. Darke’s treatment under the gene therapy program.
To sustain his or her burden of proof of negligence in a medical malpractice action, the plaintiff must initially establish that a doctor-patient relationship existed. Santos v. Kim, 429 Mass. 130, 133 (1999); Perez v. Bay State Ambulance & Hosp. Rental Serv., 413 Mass. 670, 676 (1992); Doherty v. Hellman, 406 Mass. 330, 333 (1989) (establishing that a physician-patient relationship must be established at the time of the alleged injury to recover under medical malpractice action). The circumstances in which a doctor-patient relationship exists depends on the particular facts of a case. Santos v. Kim, 429 Mass. at 133. Summary judgment is seldom granted in negligence actions because such claims often involve questions of fact. Manning v. Nobile, 411 Mass. 382, 388 (1991).
A doctor-patient relationship is predicated upon the extent to which the doctor is involved with the treatment of the patient and, thus, accepts responsibility for the care of that patient. Santos, 429 Mass. at 137; Campbell v. Thorton, 368 Mass. 528, 535-36 (1975) (declining to impose medical malpractice liability on the defendant merely because of his position as chief of staff of the hospital). For such a relationship to arise, the circumstances do not require the doctor to have physically treated the patient; rather, such a relationship exists where the patient entrusts his or her treatment to the doctor, and the doctor takes some affirmative action with regard to the personal treatment and care of the patient.[2] Id. at 133; Doherty, 406 Mass. at 333 (noting that a doctor-patient relationship is a consensual relationship); Lambley v. Kameny, 43 Mass.App.Ct. 277, 283-84 (1997). Accordingly, for example, Massachusetts courts have determined that the doctor must stand in a relationship with the patient amounting to more than that of mere informal consultant or assisting physician. Halley v. Birbiglia, 390 Mass. 540, 548-49 (1983); Harnish v. Children’s Hosp. Med. Ctr., 387 Mass. 152, 159 (1982).
Mrs. Darke contends that Dr. Isner was intimately involved in Mr. Darke’s treatment to the extent sufficient to create a doctor-patient relationship as illustrated by the following facts. Dr. Isner undertook to determine Mr. Darke’s eligibility for the gene therapy procedure by performing an endocardial mapping test on Mr. Darke. In addition, as part of his patient assessment, Mr. Darke underwent another procedure for which Dr. Isner is listed as his physician. The results of these tests indicated Mr. Darke’s probable candidacy for the gene therapy program, which Dr. Isner reflected in Mr. Darke’s progress chart. Subsequently, Dr. Isner referred Mr. Darke to Dr. Symes for pre-surgeiy consultation. Thereafter, Mr. Darke enrolled in the gene therapy program during which time he was told by members of the study that Dr. Isner was his doctor, and he was directed to Dr. Isner for any questions or concerns he may have had about the trial. Furthermore, Dr. Isner, as principal investigator, exercised directive authority and control over the gene therapy protocol under which Mr. Darke participated and in which the gene therapy procedure constituted the basis of treatment.[3] In conjunction with this authority, Dr. Isner assumed responsibility for the safety *423 and welfare of persons enrolled in the gene therapy study pursuant to federal guidelines.
In light of the evidence set forth above and viewed by the court in a light most favorable to Mrs. Darke, Mrs. Darke has adduced sufficient facts to present a genuine issue as to whether Dr. Isner’s involvement with Mr. Darke reached the level necessary to establish a doctor-patient relationship. Consequently, the estate of Dr. Isner’s motion for summary judgment as to Count II for negligence under the wrongful death statute is DENIED.
C. Gross Negligence (Count III)
The question before the court is whether a reasonable trier of fact could find Dr. Isner liable for gross negligence. Like in actions of ordinary negligence, summary judgment is not often granted when the claim is one of gross negligence. Inferrera v. Sudbury, 31 Mass.App.Ct. 96, 103 (1991). Based upon the summary judgment record viewed in a light most favorable to Mrs. Darke and drawing all reasonable inferences therefrom, a genuine issue exists as to whether Dr. Isner, as a cardiac specialist and principal investigator of an experimental gene therapy program, grossly deviated from the accepted standard in the treatment of Mr. Darke.
In Altman v. Aronson, 231 Mass. 588 (1919), the Supreme Judical Court defined gross negligence as follows:
Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duiy of an aggravated character as distinguished from mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duly respecting the rights of others.
Altman, 231 Mass. at 591-92.
In her summary judgment materials, Mrs. Darke offers the expert opinions of Dr. Edmund Sonnenblick, Dr. Stephen M. Factor and Dr. Carey Gross. In consideration of the experimental nature of the study, Drs. Sonnenblick and Factor opine that, upon review of Mr. Darke’s pre-surgery test results, a reasonable doctor in Dr. Isner’s position would have determined Mr. Darke ineligible for the experimental gene therapy program under the clinical protocol for which Dr. Isner, in part, was responsible in the development. At the least, a reasonable doctor in Dr. Isner’s position should have accounted for and attempted to reconcile the contradictory opinion of Dr. Johnson regarding Mr. Darke’s candidacy for repeat revascularization. Furthermore, in Dr. Cary Gross’ opinion, Dr. Isner’s financial stake in the success of the gene therapy treatment compromised the manner in which the clinical trial was conducted. Therefore, in light of this evidence, the court cannot as a matter of law conclude that Dr. Isner was not grossly negligent. Accordingly, the estate of Dr. Isner’s motion for summaiy judgment as to Count III for gross negligence is DENIED.
D. Intentional Infliction of Emotional Distress (Count IV)
To prevail on a claim of intentional infliction of emotional distress, the plaintiff must establish that: (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his or her conduct; (2) the defendant’s conduct was extreme and outrageous; (3) the actions of the defendant were the cause of the plaintiffs distress; and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it. Agis v. Howard Johnson Co., 371 Mass. 140, 144 (1976); Quinn v. Walsh, 49 Mass.App.Ct 696, 706 (2000).
As a threshold matter, the court must determine whether the conduct alleged may reasonably be viewed as extreme and outrageous. Redgrave v. Boston Symphony Orchestra, Inc., 557 F.Sup. 230, 236 n.7 (D.Mass. 1983). Mrs. Darke argues that the alleged actions of Dr. Isner can be considered of such a degree.
To constitute extreme and outrageous conduct, the alleged conduct must go beyond all possible bounds of decency as to be utterly intolerable in a civilized community. Agis, 371 Mass. at 144; Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994) (asserting that extreme and outrageous conduct represents more than mere annoyances, threats or petty oppressions). In assessing the defendant’s conduct, a trier of fact is entitled to draw “reasonable inferences from the totality of the circumstances” and is entitled to put as harsh a face on the conduct as the basic facts would reasonably allow. Richey v. American Auto Ass’n, 380 Mass. 835, 839 (1980); Boyle v. Wenk, 378 Mass. 592, 595 (1979).
Mrs. Darke advances the following facts relevant to her intentional infliction of emotional distress claim. Dr. Isner had a significant financial stake in the successful outcome of the clinical trial in which Mr. Darke was a participant, a fact which he concealed from the Darkes. Dr. Isner conducted a post-mortem cardiac pathology of Mr. Darke’s heart for which, as an interested party, Dr. Isner should not have been the operator. After Mr. Darke’s death, Dr. Isner was reticent concerning the exact cause of Mr. Darke’s death in spite of Mrs. Darke’s inquiries. In reaction to a news article about Mr. Darke’s death, Dr. Isner telephoned Mrs. Darke on the one-year anniversary of Mr. Darke’s passing in the presence of a gene therapy research nurse. During this conversation, although aware of her previous requests for information, Dr. *424 Isner placed Mrs. Darke on speaker phone and expressed his surprise over the media reports and Mrs. Darke’s apparent confusion about the nature of her husband’s death.
A claim for intentional infliction of emotional distress “is an issue for the jury if reasonable people could differ on whether the conduct is ‘extreme and outrageous.’ ” Vittands v. Sudduth, 49 Mass.App.Ct. 401, 411 (2000). From this evidence viewed in a light most favorable to Mrs. Darke, the court finds that reasonable persons may differ as to whether or not the conduct complained of was extreme and outrageous under the circumstances of this case. Therefore, the estate of Dr. Isner’s motion for summary judgment with respect to Count IV is DENIED.
E. Breach of Contract (Count VI)
The estate of Dr. Isner argues that there exists no evidence in this case that Dr. Isner entered into a contract with either Mrs. Darke or Mr. Darke under which Mrs. Darke can recover on her breach of contract claim. The court agrees with this assertion.
In the Commonwealth, in the context of an agreement between doctor and patient to provide medical services, the courts recognize an action in contract in circumstances in which the doctor expressly agrees to affect a cure or produce a particular medical result and, ultimately, fails to do so. Salem Orthopedic Surgeons, Inc. v. Quinn, 377 Mass. 514, 517 (1979); Sullivan v. O'Connor, 363 Mass. 579, 582 (1973). However, to proceed with an action based on such an alleged contract, the plaintiff must establish the existence of such a contract by “clear proof.” Sullivan, 363 Mass. at 583; Carney v. New England Telephone & Telegraph Co., 353 Mass. 158, 164 (1967) (stating that where the existence of a contract is in issue, the burden is on the plaintiff to show the contract was made). To carry his or her burden of “clear proof,” the plaintiff must show that the doctor made a statement or statements that could be reasonably interpreted by the patient as a promise to achieve a given result or cure. Clevinger v. Haling, 379 Mass. 154, 159 (1979). In this case, Mrs. Darke has not provided “clear proof’ of the existence of a contract, oral or written, with Dr. Isner by which her claim of breach of contract can withstand summary judgment.
Based upon the record before the court, it appears the only evidence to which Mrs. Darke attributes the formation of a binding contract with Dr. Isner is the informed consent document signed by Mr. Darke prior to surgery. However, this form did not state that the gene therapy procedure would cure Mr. Darke’s cardiac ailments. Nor did it state that the procedure would improve his condition whatsoever. In fact, the form expressly disclaims any guarantee that the gene therapy procedure would successfully relieve Mr. Darke’s ailments. Furthermore, the Darkes were aware of the experimental nature of the gene therapy procedure at the time Mr. Darke signed the consent form. Consequently, the informed consent form does not constitute an express contract to cure or to provide a particular medical result. Accordingly, Mrs. Darke has failed to present sufficient facts from which the existence of a contract can be established, and the estate of Dr. Isner’s motion for summary judgment as to Count VI is therefore ALLOWED.
F. Deceit/Intentional Misrepresentation/ Fraud in the Inducement (Count VII)
Although the torts of deceit and fraud in the inducement differ, for the purposes of the defendant’s summary judgment motion, the court treats the plaintiffs claim as one for the tort of deceit into which the common elements of other claims therein alleged may be subsumed. Plumer v. Luce, 310 Mass. 789, 801-02 (1942). To prevail on a claim of deceit, the plaintiff must prove: (1) that the defendant made a misrepresentation as to a matter of material fact, which may include a belief or an intention; (2) that the misrepresentation was made with the intention to induce the plaintiff to act upon it; (3) that the misrepresentation was made with knowledge of its falsity or was made of a fact susceptible of actual knowledge with recklessness as to its truth or falsehood, or was the failure to disclose known facts when there was a duty to disclose such facts; (4) that the plaintiff justifiably relied and acted upon the misrepresentation; and (5) that damage resulted therefrom. Barrett Associates, Inc. v. Aronson, 346 Mass. 150, 152 (1963); Ravosa v. Zais, 40 Mass.App.Ct. 47, 51 (1996).
Mrs. Darke’s claim of deceit fundamentally rests upon Dr. Isner’s failure to disclose certain facts known to him at the time Mr. Darke decided to undergo the gene therapy treatment. Whether Dr. Isner was under a duty to ensure the disclosure of such facts to Mr. Darke depends upon whether Dr. Isner failed in some way to comply with a duty owed to Mr. Darke as created by the doctor-patient relationship. Haggerty v. McCarthy, 344 Mass. 562, 566-67 (1962); Goodwin v. Agassiz, 283 Mass. 358, 362 (1933) (commenting that mere silence usually does not amount to a breach of a duty, but the parties may stand in such relation to each other that an equitable responsibility arises to communicate certain facts).
As determined earlier herein, the evidence before the court presents a genuine issue as to whether Dr. Isner stood in a doctor-patient relationship to Mr. Darke. It follows that a special duty owed by Dr. Isner to Mr. Darke may have arisen in the context of this relationship. Furthermore, viewing the facts in the summary judgment record in a light most favorable to Mrs. Darke and drawing all reasonable inferences therefrom, the court finds a genuine issue as to whether the scope of this duty required Dr. Isner to communicate certain known facts to Mr. Darke, which he did not do, and whether such facts were indeed material under the circumstances. Dr. Isner’s noncompliance with this duty would have deprived Mr. *425 Darke of the right to exercise an informed consent and consequently influenced his submission to a procedure to which he may not otherwise have assented. Accordingly, the court finds sufficient evidence in the summary judgment record to support Mrs. Darke’s claim of deceit against Dr. Isner. Therefore, the estate of Dr. Isner’s motion for summary judgment as to Count VII is DENIED.
G. Violation of G.L.c. 93A (Count X)
In an effort to encourage more equitable behavior in the commercial marketplace, G.L.c. 93A (c. 93A) provides consumers in Massachusetts protection from and recourse for unfair and deceptive acts on the part of persons conducting trade or commercial activities. Posnik v. Mass. Med. Prof'l Ins. Ass’n, 417 Mass. 48, 53 (1994). Accordingly, under c. 93A, liability will only be imposed if the plaintiff establishes that the “defendants were ‘persons engaged in the conduct of any trade or commerce’ or that their participation took place in a business context.” Begelfer v. Najarian, 381 Mass. 177, 191 (1980). In this case, Mrs. Darke asserts the applicability of c. 93A insofar as Dr. Isner possessed a significant financial interest in the corporate entity sponsoring the gene therapy trial, from which Dr. Isner would reap enormous financial gain if found successful. Mrs. Darke alleges that Dr. Isner’s failure to communicate certain information to Mr. Darke prior to his inclusion in the treatment program was the product of personal financial incentive and, as such, represented an unfair and deceptive act within the meaning of c. 93A.
In the context of an action for medical malpractice or negligence, the underlying purpose of c. 93A remains unchanged; a viable c. 93A claim will arise in circumstances in which a medical provider makes intentional misrepresentations, or commits unfair or deceptive acts concerning the entrepreneurial or business aspects of providing medical services. Daviris v. Petros, 442 Mass. 274, 279 (2004). In Daviris, the Supreme Judicial Court concluded that “a claim for the negligent deliveiy of medical care, without more, does not qualify for redress under [Massachusetts’] consumer protection statute, G.L.c. 93A.” Daviris, 442 Mass. at 278. Specifically, the court determined that the plaintiffs c. 93A claim could not survive summary judgment when the plaintiff based her claim on a lack of informed consent theory of liability. Id. at 284. However, the court did not completely foreclose the applicability of c. 93Ato medical providers. Indeed, the court determined that c. 93A extends to the “entrepreneurial and business aspects of providing medical services, for example, advertising and billing.” Id. at 279.
The record before the court shows that the success of the gene therapy trial was a necessary step towards the business objective of marketing and commercializing the gene therapy treatment pioneered by Dr. Isner, which, in turn, meant direct financial reward to Dr. Isner. When viewed as such, the clinical study in which Mr. Darke agreed to participate appears to have been a means to a lucrative end for Dr. Isner. Nevertheless, there is nothing in the record to distinguish the factual underpinnings of Mrs Darke’s medical malpractice claim from those that form the basis of her c. 93A claim. If proved, such facts would not concern any entrepreneurial or business aspect of the clinical trial or the gene therapy treatment as contemplated by the Supreme Judicial Court in Daviris; rather, such facts would only establish potential negligence on the part of Dr. Isner in the implementation of the clinical trial. Therefore, like the plaintiff in Daviris, Mrs. Darke’s c. 93A claim merely alleges the negligent delivery of medical care upon which, without more, her c. 93A claim cannot stand. Id. at 279-81. Consequently, the estate of Dr. Isner’s motion for summary judgment as to Count X is ALLOWED.
III. Claims Against Dr. Symes
Dr. Symes has moved for summary judgment on Mrs. Darke’s claims of intentional battery (Count I), gross negligence (Count III), breach of contract (Count VI), and deceit, intentional misrepresentation, and fraud in the inducement (Count VII).
A. Intentional Battery (Count I)
For the reasons discussed in the analysis of the estate of Dr. Isner’s summary judgment motion as to Count I, Mrs. Darke cannot establish her intentional battery claim against Dr. Symes. Therefore, Dr. Symes’ motion for summary judgment as to Count I is ALLOWED.
B. Gross Negligence (Count III)
Although the court has not been compelled to examine whether a claim of negligence could be maintained against Dr. Symes in the first instance, Dr. Symes argues in his summary judgment motion that his conduct as alleged did not reach the level of gross negligence as a matter of law. As already defined herein, gross negligence is “substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from the mere failure to exercise ordinary care . . .” Altman, 231 Mass. at 591-92. Summary judgment is not often granted when the claim is one of gross negligence. Inferrera, 31 Mass.App.Ct. at 103.
In this case, viewing the evidence in the summary judgment record in a light most favorable to Mrs. Darke, there are genuine issues of material fact as to Dr. Symes’ personal duty to procure Mr. Darke's informed consent prior to surgery as well as the validity of such consent. In addition, a genuine issue exists as to the propriety of Dr. Symes’ preoperative judgment that Mr. Darke remained eligible for the gene therapy procedure. Therefore, the court cannot affirmatively determine that there is no rational basis upon which *426 Dr. Symes may be found grossly negligent. Broderick v. Brandy Hill Co., 36 Mass.App.Ct. 948, 949 (1994). Accordingly, Dr. Symes’ motion for summary judgment as to Count III is DENIED.
C. Breach of Contract (Count VI)
For the same reasons discussed in the analysis of the estate of Dr. Isner’s summary judgment motion as to Count VI, Mrs. Darke has not provided evidence that supports the existence of a contract in this case. Therefore, Dr. Symes’ motion for summary judgment as to Count VI is ALLOWED.
D. Deceit/Intentional Misrepresentation/ Fraud in the Inducement (Count VII)
For Mrs. Darke to recover on her claim of deceit, she must prove that Dr. Symes made a “false representation of material fact with knowledge of its falsity for the purpose of inducing [Mr. Darke] to act thereon, and that [Mr. Darke] relied upon the representation as true and acted upon it to his damage.” Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982). Upon examination of the record, the court finds that Mrs. Darke cannot prove the necessary elements of her claim of deceit against Dr. Symes.
It is well-established that deceit must be positively proved and that it is never to be presumed. Rankin v. New York, New Haven, & Hartford R.R. Co., 338 Mass. 178, 186. The subject of the representation must be susceptible to actual knowledge and not a matter of opinion, estimate or judgment. Snyder v. Sperry & Hutchinson Co., 368 Mass. 433, 444 (1975). Furthermore, proof of negligence itself does not establish wilfulness to fulfill the intent element of deceit or fraud. Christian v. Mooney, 400 Mass. 753, 764-65 (1987).
In her opposition to the summary judgment motion of Dr. Symes, Mrs. Darke specifically contends that Dr. Symes’ diagnosis of Mr. Darke’s condition and subsequent recommendation for the gene therapy procedure was so off-base to be tantamount to fraud or deceit. However, Mrs. Darke has not proffered specific facts that Dr. Symes knew his diagnosis to be false or that he knowingly undertook to misrepresent Mr. Darke’s true medical condition. Instead, the record demonstrates that, based upon Mr. Darke’s pre-surgeiy test results and general medical history, Dr. Symes exercised his judgment as a doctor in forming an opinion about Mr. Darke’s medical condition, and, correspondingly, his candidacy for the clinical study. Although an issue may exist as to the ultimate soundness of Dr. Symes’ diagnosis, this issue does not evidence a misrepresentation on the part of Dr. Symes even if his diagnosis were to prove erroneous.[4] Consequently, Mrs. Darke has no reasonable expectation of proving that Dr. Symes knowingly misrepresented a material fact, which is an essential element of her claim of deceit. Accordingly, Dr. Symes’ motion as to Count VII is ALLOWED.
IV. Claims Against Dr. Losordo
Dr. Losordo has moved for summary judgment on Mrs. Darke’s claim of negligence (Count II).
A. Negligence/Wrongful Death (Count II)
To establish a medical malpractice action based on negligence against a physician, the plaintiff must show: (1) a doctor-patient relationship existed; (2) the doctor did not conform to accepted medical standards in performing his duties with regard to the patient; and (3) damage resulted from this failure to conform. Kapp v. Ballantine, 380 Mass. 186, 193 (1980). Therefore, in the first instance, the plaintiff must demonstrate the existence of a doctor-patient relationship. Santos, 429 Mass. at 133; Perez, 413 Mass. at 676.
In deciding the extent of involvement necessary to establish a doctor-patient relationship, Massachusetts courts have declined to impose liability upon doctors in circumstances in which the involvement with the patient is only superficial or tangential in nature. Doherty, 406 Mass. at 334; Halley, 390 Mass. at 548-49; Harnish, 387 Mass. at 159. In this case, Dr. Losordo’s relationship to Mr. Darke under the gene therapy study is too attenuated to discern from the evidence the existence of a doctor-patient relationship for the purposes of this medical malpractice action.
Mrs. Darke grounds the existence of a doctor-patient relationship between Dr. Losordo and Mr. Darke on the following facts. Dr. Losordo was a subinvestigator for the clinical study in which Mr. Darke was a participant. Dr. Larsen referred Mr. Darke to Dr. Losordo by letter in which Mr. Darke is said to have been offered repeat revascularization surgery by Dr. Johnson. Dr. Losordo was part of the patient assessment team in which he helped determine the eligibility of potential gene therapy patients under the protocol. After Mr. Darke’s death, Dr. Losordo signed as Mr. Darke’s physician an insurance form for Mr. Darke’s employer as well as the death notice and certificate. Nevertheless, these facts fail to demonstrate that Dr. Losordo undertook to diagnose and/or treat Mr. Darke in a manner suggesting a doctor-patient relationship. Lambley v. Kameny, 43 Mass.App.Ct 277, 283 (1997).
When viewed in a light most favorable to Mrs. Darke, at most, these facts show that Dr. Losordo proposed Mr. Darke’s candidacy for the clinical trial and was aware of his participation. Indeed, Dr. Losordo’s involvement in the care of Mr. Darke could not be considered sufficiently personal merely by virtue of his position as one of several subinvestigators of the study. Therefore, without more, Dr. Losordo’s involvement with Mr. Darke was insufficient to constitute a doctor-patient relationship. Accordingly, Dr. Losordo’s motion for summary judgment as to Count II is ALLOWED.
V. Claims Against St. Elizabeth’s
Mrs. Darke has waived all claims against St. Elizabeth’s except for her claim under G.L.c. 93A *427 (Count X). Although St. Elizabeth’s does not directly confront this claim in its summary judgment motion, Mrs. Darke asserts in her opposition that St. Elizabeth’s was independently negligent from which a c. 93A violation can be established. Since St. Elizabeth’s moved for summaiy judgment as to its liability for negligence, the court treats St. Elizabeth’s motion as one for summary judgment on Mrs. Darke’s G.L.c. 93A claim (Count X).
A. Violation of 93A (Count X)
As stated above herein, G.L.c. 93A prohibits unfair or deceptive acts or practices among those engaged in trade or commerce. Mrs. Darke alleges that St. Elizabeth’s violated c. 93A insofar as it possessed a financial interest in the corporation sponsoring the gene therapy program from which it intended to profit and failed to warn the Darkes of this interest. However, the court finds that St. Elizabeth’s actions in this case did not take place in a “business context” within the meaning of c. 93A. Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 24 (1997).
Chapter 93A applies to “any person,” including hospitals and other organizations, “who engages in conduct of any trade or commerce.” G.L.c. 93A, §11; Planned Parenthood v. Problem Pregnancy, Inc., 398 Mass. 480, 493 (1986) (an organization’s status as charitable coiporation is not dispositive of the applicability of c. 93A). In light of the breadth of its language, the applicability of c. 93A requires fact-specific inquiry into whether the transaction at issue arose in a “business context.” Id. at 24-26. Factors relevant to this inquiiy include: the nature of the transaction; the character of the parties involved; and the activities engaged in by the parties. Begelfer, 381 Mass. at 190-91.
Although St. Elizabeth’s ultimately stood to profit from the marketing and commercialization of the gene therapy treatment, the conduct at issue occurred in the context of a clinical trial for which St. Elizabeth’s acted as the clinical site and medical oversight committee. Although St. Elizabeth’s was obligated to safeguard the rights and welfare of the human subjects participating in the study, trade or commerce as contemplated under c. 93A refers to commercial marketplace transactions and not claims arising from a hospital’s possible breach of duly to a patient in the administration of a clinical trial. Planned Parenthood, 398 Mass. at 493. Accordingly, c. 93A is inapplicable to Mrs. Darke’s allegation against St. Elisabeth’s. Therefore, summary judgment as to Count X against St. Elizabeth’s is ALLOWED.[5]
V. Claims Against VGI
VGI has moved for summaiy judgment on Mrs. Darke’s claim that VGI is vicariously liable for the tortious acts of Dr. Isner, Dr. Symes, and Dr. Losordo in the treatment of Mr. Darke as alleged heretofore. Furthermore, VGI has moved for summaiy judgment as to Mrs. Darke’s claim of negligence for which Mrs. Darke asserts VGI is independently liable.
A. VGI’s Vicarious Liability for the Acts of Drs. Isner, Symes and Losordo
Massachusetts courts have adopted a two-pronged approach to the imposition of vicarious liabiliiy. Specifically, a principal is vicariously liable for the tortious conduct of an agent if: (1) at the time of the conduct an employer-employee, or master-servant, relationship existed between them; and (2) the conduct occurred within the scope of that employment. Dias v. Brighman Med. Ass’n, 438 Mass. 317, 322 (2002). Accordingly, the question of vicarious liability is a factually driven inquiiy. Hopper v. Callahan, 408 Mass. 621, 634 (1990).
An employer-employee relationship is manifested by a number of factors. Dias, 438 Mass. at 323. Such factors include: the right of the employer to control the employee’s activities; the method of payment; the skill required in the particular occupation; whether the employer supplies the instrumentalities and place of work, as well as the parties’ own belief as to whether they created an employer-employee relationship. Restatement (Second) of Agency §220 (1958).
In the medical area, given the high degree of skill involved in the practice of medicine, the right to direct and control an alleged employee’s activities remains an important factor in determining the existence of an employer-employee relationship. Kelley v. Rossi, 395 Mass. 659, 662 (1985) (“the very nature of a physician’s function tends to suggest that in most instances he will act as an independent contractor”). However, the court still must consider a varieiy of factual ingredients to determine whether a doctor is acting as an employee. Id. at 664.
Although little authority exists on the liability of a corporate sponsor of a clinical trial for the tortious acts of participating doctors, there is nothing to suggest that such a party cannot be held vicariously liable if the common requisites of an employer-employee relationship are present Dias, 438 Mass. at 323. Under this premise, the court must look to the record to determine whether Mrs. Darke has advanced facts demonstrating an employer-employee relationship between VGI and Drs. Isner, Symes and Losordo.
The summary judgment record shows that VGI sponsored the gene therapy clinical study in which Drs. Isner, Symes and Losordo acted as investigators. In its role as sponsor, VGI supplied VEGF-2 to the clinical investigators to administer to patients participating in the trial. Furthermore, VGI, in accordance with the relevant FDA regulations, took on the responsibility of selecting qualified investigators, ensuring the proper conduct of the trial, monitoring the progress of the study, and ensuring the safety and effectiveness of the gene therapy treatment. 21 C.F.R. §312.50. In essence, VGI supervised the implementation of the study.
*428 While the foregoing facts indicate that VGI exercised control over the format and conduct of the clinical protocol, this evidence does not demonstrate that VGI had the right to control the physical conduct of the investigators in their clinical activities for which Mrs. Darke asserts VGI’s vicarious liability. Kelley, 395 Mass. at 661. The right to supervise is not enough by itself to inspire vicarious liability. Hohenleitner v. Quorum Health Res., Inc., 435 Mass. 424, 435 (2001). Nevertheless, this circumstance does not end the court’s inquiry; the court may look to additional factors in its determination. Konick v. Berke, Moore Co., Inc., 355 Mass. 463, 467-68 (1969).
Viewing the evidence in the record in the light most favorable to her, Mrs. Darke has presented evidence specific to Dr. Isner from which a reasonable person may find an employer-employee relationship. In particular, the fact that VGI compensated Dr. Isner for services of the kind he performed as principal investigator under the protocol coupled with evidence that Dr. Isner devoted a significant portion of his professional life to VGI militates in favor of the recognition of an employer-employee relationship for the purposes of vicarious liability.[6] Furthermore, the fact that Dr. Isner possessed a significant financial share in VGI creates a sufficient basis upon which a reasonable person could find that Dr. Isner acted in furtherance of VGI in the course of the clinical trial. Wang Lab., Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986) (stating that the alleged tortious conduct of an employee or agent, including his or her intentional torts, falls within the scope of employment if: (1) the conduct is of the kind the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) the conduct is motivated, in part, by a purpose to serve the employer). Consequently, a genuine issue of material fact exists regarding VGI’s vicarious liability for the actions of Dr. Isner. Therefore, VGI’s motion for summaiy judgment as to Mrs. Darke’s claim of vicarious liability as it relates to the actions of Dr. Isner is DENIED.
B. VGI’s Liability for Negligence (Count II)
To sustain her burden of proof of negligence, Mrs. Darke must show: (1) the duty owed to Mr. Darke by VGI, (2) breach of this duty, (3) which was the proximate cause (4) of the Darke’s damage. Rahilly v. North Adams Reg’l Hosp., 36 Mass.App.Ct. 714, 719-20 (1994). Thus, to maintain that VGI is negligent, Mrs. Darke must initially show that VGI in fact owed a direct duty to Mr. Darke under the circumstances. On this issue, the court determines that Mrs. Darke has failed to present sufficient facts to establish such a duty.
According to the relevant FDA regulations, a sponsor “does not actually conduct the investigation unless the sponsor is a sponsor-investigator”; rather, a sponsor distributes an investigational drug to investigators for clinical trials and is responsible for obtaining FDA approval to conduct a trial and for monitoring and reporting the results of the trial. 21 C.F.R. §312(b). Corporations or other entities do not qualify as sponsor-investigators. Id. Conversely, an investigator is defined as “an individual who actually conducts a clinical investigation (i.e., under whose immediate direction the drug is administered or dispensed to a subject).” Id.
Pursuant to FDA requirements, the responsibilities of investigators include: ensuring that an investigation is conducted according to the signed investigator statement, the investigational plan, and applicable regulations, protecting the rights, safety, and welfare of subjects under the investigator’s care, and obtaining the informed consent of each human subject to whom the drug is administered. 21 C.F.R. §312.60. In light of these enumerated responsibilities, VGI, as sponsor, did not directly owe specific duties to Mr. Darke, the breach of which gave rise to a cause of action for negligence. Instead, such duties inhered in the responsibilities imposed upon the investigators in this case. Accordingly, Mrs. Darke cannot prove her negligence claim against VGI and, consequently, VGI’s motion for summaiy judgment as to Count II is ALLOWED.
ORDER
For the foregoing reasons, the Estate of Dr. Isner’s motion for summaiy judgment as to Counts II, III, IV, and VII is DENIED and as to Counts I, VI, and X is ALLOWED. Dr. Symes’ motion as to Count III is DENIED and as to Counts I, VI, and VII is ALLOWED. Dr. Losordo’s motion as to Count II is ALLOWED. St. Elizabeth’s motion as to Count X is ALLOWED. VGI’s motion as to its vicarious liability for the acts of Dr. Isner is DENIED and as to Count II for its independent negligence is ALLOWED.

 VGI was found not properly before the Tribunal.

 The Supreme Judicial Court determined in Santos that the existence of a doctor-patient relationship presupposes a duty of care personally owed to the patient by the doctor. Santos, 429 Mass. at 137.

 It is the principal investigator who is held responsible for the conduct of the investigation and subject to enforcement action for violations of FDA regulations. 21 C.F.R. §312.60.

 The court notes that it is possible to find differences of opinion amongst doctors in any branch of medicine; but, a contrary medical opinion, without more, should not expose a doctor to liability for deceit or fraud.

 In light of this ruling, the court need not address St. Elizabeth’s argument regarding the applicability of the Massachusetts Charitable Immunity Statute, G.L.c. 231, §85K, to the circumstances of this case. However, the court finds it important to note that the $20,000 statutory cap on damages against charitable entities for tort liability, contained in G.L.c. 231, §85K, does not apply to liability under G.L.c. 93A. Linkage Corp., 425 Mass. at 27.

 Although VGI labels its relationship with Dr. Isner as that of an independent contractor, this language does not in fact create such a relationship. Restatement (Second) of Agency §1, Comment b (1958).